**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

v.

KEVIN DWIGHT CLEMENTS and
KARYN L. ESTRADA,

Case No. 5:23-cr-01389-MIS

      Defendants.

## RESTITUTION ORDER

THIS MATTER is before the Court on the United States of America's ("Government")

Sealed Request for Restitution ("Mot. for Restitution"), ECF No. 282, filed January 21, 2025. On

February 11, 2025, Defendant Karyn L. Estrada ("Estrada") filed a Response ("Estrada Restitution

Resp."), ECF No. 301, and Defendant Kevin Dwight Clements ("Clements") filed a Response

("Clements Restitution Resp."), ECF No. 302. The Court held an evidentiary hearing on April 22,

2025. *See* ECF No. 314. Thereafter, on May 28, 2025, the Court issued an Order Regarding the

Discount Rate to Apply to the Restitution Order ("Order Regarding the Discount Rate"). ECF No.

315. The Government filed a Response to the Order Regarding the Discount Rate on June 26,

2025, ECF No. 317, to which Defendants timely replied, ECF Nos. 319, 321. The Court held a

status conference on September 17, 2025, *see* ECF No. 327, and the next day, with the agreement

of the Parties, issued an Order for Report from its Rule 706 Expert ("Order for Report"), ECF No.

328. The Rule 706 expert submitted his report ("Rule 706 Expert Report"), docketed on October

7, 2025 at ECF No. 329, to which the Government filed a response on October 21, 2025, ECF No.

331. Defendant Clements filed an untimely response to the Court's Order for Report, maintaining

"all previous motions and objections" to an order of restitution. ECF No. 330. Upon consideration

of the Parties' submissions, the record, and the relevant law, the Court will **GRANT IN PART** the Government's Motion for Restitution.

## I.  Background

This case involves the physical and sexual abuse of minor Jane Doe ("Doe"). Defendant Clements began sexually abusing Doe in November of 2018 when Doe was ten years old. Clements Presentence Investigation Report ("PIR") ¶ 10, ECF No. 214. The abuse continued for approximately seven months. *Id.*

At the time, Clements was dating Doe's mother, Defendant Estrada. *Id.* ¶ 8. Estrada permitted Clements to sexually abuse Doe in exchange for cash. *See id.* ¶ 17; Estrada Plea Agreement ¶ 9, ECF No. 143.

The first time Clements sexually abused Doe, "he took her into the spare bedroom in his home, and her mother, Estrada, was in the room. Doe screamed out to her mother for help, but her mother only watched until she (Estrada) eventually walked out of the room, leaving Doe alone in the room with Clements." Clements PIR ¶ 10, ECF No. 214. "Doe testified that it was painful when Clements penetrated her vagina with his penis and that there was blood on the toilet paper she used to wipe afterwards." *Id.*

The following week, Clements grabbed Doe and threw her into the same bedroom where the first assault occurred. *Id.* ¶ 11. Clements then attempted to remove Doe's clothing. *Id.* As he attempted to remove her underwear, however, Doe resisted, and Clements began to rip her underwear off. *Id.* Clements then touched Doe's genitals before vaginally penetrating her while using his hand to hold her arms so she could not move. *Id.* When she cried, "Clements covered her mouth, eventually taping her mouth with duct tape and advising Doe that if she yelled, he would kill her." *Id.* Clements also pointed a gun at Doe's head and put a knife to her stomach while

threatening to kill her. *Id.* During the assault Clements stepped on Doe's stomach, hit her, and kicked her in the head. *Id.* Although the door was closed during the assault, Doe could hear Estrada moving around in the kitchen. *Id.* Doe stated she woke up the next day in the kitchen with all her clothing on except for her underwear. *Id.*

On another occasion, during a trip to a store, Clements pushed Doe into his car, tied her hands behind her back, and bound her feet. *Id.* ¶ 12. Clements placed Doe on the floor of the vehicle, covered her with a blanket, and then drove them back to his residence where he advised Doe that if she told anyone he would harm her family. *Id.* When they arrived at his home Doe attempted to flee, but was caught by Clements who warned her that he would shoot her if she did it again. *Id.*

During a fourth assault, Clements put Doe in a duffle bag, placed her in the trunk of his car, and drove her to his workshop building on the Ponderosa RV Park property. *Id.* ¶ 14. At the time, Clements owned the Ponderosa RV Park. *Id.* ¶ 6. Clements unzipped the bag and held on to Doe, but she briefly escaped once inside the building. *Id.* ¶ 14. When Clements caught her, he struck her with a board, resulting in bruising to her stomach and legs. *Id.* Clements then took Doe to the other side of the building, took her clothes off, and rubbed her vagina with his hand. *Id.* Clements then punched Doe in the stomach. *Id.* Doe's next recollection was waking up in the building, putting on her clothing, and returning to Clements' home where she hid in the backyard until Estrada returned. *Id.*

On another occasion, Doe fell asleep in the kitchen of Clements' home and awoke as he tied her arms to the bed and placed duct tape on her mouth. *Id.* ¶ 15. When Doe screamed, Clements punched her in the face. *Id.* Doe's next memory was waking up naked the following day with

3

bruising on her right thigh and stomach. *Id.* Doe saw Estrada and called out to her, but Estrada ignored her. *Id.*

In May of 2019, while sitting at Clements's kitchen table, Clements turned off the lights, grabbed Doe, and took her to the bedroom. *Id.* ¶ 16. Clements then pushed Doe to the floor and directed her to get up. *Id.* "When Doe declined, he picked her up, threw her onto the bed and told her to undress." *Id.* When Doe again declined, Clements took off her clothes, got on top of her, and began kissing her while striking her about her face, bruising her. *Id.* Doe told Clements that she was going to tell someone what he was doing, at which time "Clements retrieved his gun and was going to shoot Doe." *Id.* The doorbell rang, however, and he left the room. *Id.* Doe then hid under the bed. *Id.* She could hear Clements yelling, but she remained hidden until Estrada, who was asleep, woke up. *Id.* Doe then asked Estrada if they could go home. *Id.* Estrada refused. *Id.* But Doe started to give Clements "attitude" and they left. *Id.* While traveling back home, Estrada yelled at Doe and told her that she should not be acting in that manner and should just "grow up already." *Id.*

On April 3, 2024, the Government charged Estrada by Information with trafficking and aiding and abetting in violation of 18 U.S.C. §§ 1590(a) and 2. ECF No. 140. The same day, Estrada waived indictment and pleaded guilty pursuant to a written Plea Agreement to the crime charged in the Information. *See* Estrada Plea Agreement ¶¶ 2, 4, ECF No. 143; Waiver of Indictment, ECF No. 142; Plea Min. Sheet, ECF No. 144; Estrada J. at 1, ECF No. 277. In her Plea Agreement, Estrada admitted the following facts:

> Between in or about November 2018 and May 2019, in Eddy County, in the District of New Mexico, I, Karyn L. Estrada, knowingly provided the services of Jane Doe, who I knew was less than 14 years old, to Kevin Dwight Clements ("Clements").

4

Specifically, during that time, I received payment of U.S. paper currency from Clements. During that time, Jane Doe, who was then 10-years-old, was in my care, custody, and control. I was aware that Clements sexually abused Jane Doe and that abuse included Clements vaginally penetrating Jane Doe with Clements' penis, which I acknowledge constitutes aggravated sexual abuse . . . I now know that Clements used a firearm during the commission of this offense . . . .

ECF No. 143 ¶ 9. Estrada acknowledged the Court can impose restitution. *Id.* at ¶ 5. The Court sentenced Estrada to life in prison for her crime, *see* Estrada J. at 2, ECF No. 277, but deferred the determination of restitution, *id.* at 6.

On April 17, 2024, a Grand Jury sitting in the District of New Mexico returned a Superseding Indictment charging Clements with sex trafficking of a minor and aiding and abetting, in violation of 18 U.S.C. §§ 1591(a)(1) and 2 (Count 1); kidnapping of a minor in violation of 18 U.S.C. § 1201(a)(1) and (g) (Count 2); possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count 3); and possession of a firearm by an unlawful user of and addicted to a controlled substance in violation of 18 U.S.C. §§ 922(g)(3) and 924 (Count 4). Superseding Indictment at 1-2, ECF No. 154.

On May 10, 2024, a jury found Clements guilty of all counts charged against him in the Superseding Indictment. Verdict, ECF No. 189. The Court sentenced Clements to consecutive terms of life imprisonment as to Counts 1 and 2, and a consecutive term of 120 months' imprisonment as to Count 3. *See* Clements J. at 3, ECF No. 244. The Government agreed to dismiss Count 4 during the sentencing hearing. *See* Am. Sentencing Min. Sheet at 2, ECF No. 247; Mot. to Dismiss Count 4, ECF No. 246; Order Granting Mot. to Dismiss Count 4, ECF No. 248. The Court deferred the determination of restitution. Clements J. at 8, ECF No. 244.

On January 21, 2025, the Government filed the instant Motion for Restitution. ECF No. 282. On February 3, 2025, the Government filed exhibits supporting its Motion for Restitution,

*see* ECF No. 293, including a Psychological Evaluation by psychologist Christopher J. Alexander, Ph.D. ("Psychological Evaluation"), ECF No. 293-7, and a report on Doe's economic losses by economist Jose R. Bucheli, Ph.D. ("Damages Report"), ECF No. 293-8. In the Damages Report, Dr. Bucheli estimates the losses derived from Doe's injuries—when considering lost earnings and employee benefits, healthcare costs, and reduced enjoyment of life—to range from $4,930,172 to $8,465,592 in present value dollars. Damages Report at Cover Page, 2-8, ECF No. 293-8. Dr. Bucheli uses a discount rate of 1.5% to convert projected future estimates to present value dollars, and states that 1.5% is "equal to the average nominal interest rate on U.S. Treasury Bills during 2003-2023." *Id.* at 2. The Government requested the Court grant restitution of $4,930,172, the lower end of Dr. Bucheli's estimate, to be paid jointly and severally by Defendants. Mot. for Restitution at 1, ECF No. 282.

On February 11, 2025, Estrada and Clements filed Responses objecting to the amount of restitution. ECF Nos. 301, 302.

On April 22, 2025, the Court held an evidentiary hearing on the Motion for Restitution. *See* Clerk's Mins. of Apr. 22, 2025 Hr'g, ECF No. 314. During the hearing, the Government introduced several exhibits without objection from Defendants, including Dr. Alexander's Psychological Evaluation and Dr. Bucheli's Damages Report. *See id.* at 1. Counsel for Defendants stipulated that Doctors Alexander and Bucheli qualify as experts. *See id.* Both experts testified at the hearing regarding the contents of their respective reports. *See id.* at 1-2. During Dr. Bucheli's testimony, he testified that 1.5% is the rate of return on twenty-year U.S. Treasury Bills. Tr. of Hr'g of Sep. 17, 2025 at 77:20-22.[1]

---

[1] The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

On May 28, 2025, the Court issued its Order Regarding the Discount Rate. ECF No. 315. Therein, the Court indicated that it "is not convinced that the U.S. Treasury Bill rates reflect 'the rate of interest that would be earned on 'the best and safest investments.'" *Id.* at 2 (quoting *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 537 (1983) (quoting *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491 (1916))). The Court opined that "[i]t seems . . . an annuity is a better investment because it offers a higher interest rate than a U.S. Treasury Bill, and is comparably safe."[2] *Id.* Thus, the Court ordered the Government to request Dr. Bucheli "submit a supplemental report that calculates Doe's losses in present value dollars using a discount rate that is commensurate with current long-term annuity rates." *Id.*

On June 26, 2025, the Government filed a Response, ECF No. 317, to which it attached Dr. Bucheli's Addendum to the Damages Report, ECF No. 317-1. The Government declined to follow the Court's directive and instead, without leave of the Court, unnecessarily explained what a discount rate is and then explained why Dr. Bucheli selected the discount rate he did. Addendum to the Damages Report at 1-2, ECF No. 317-1. As to his reasoning for selecting 1.5%, Dr. Bucheli cited no facts and thereby declined to exercise the expertise for which he was brought into this case. *Id.* Instead, he went outside his area of expertise and cited to seven legal authorities. *Id.* The Court does not need his assistance with legal analysis. Additionally, and again unnecessarily, Dr. Bucheli provided alternative methods for distributing restitution payments to Doe—i.e., a lump sum payment or annual payments of the lump sum amount calculated at a 1.5% discount rate over

---

[2] An annuity is an investment product that pays a customer a set amount annually in exchange for funds initially belonging to the customer. Jeanette Beebe, *What Is a Fixed Annuity? Uses in Investing, Pros, and Cons*, Investopedia (Nov. 5, 2025 at 0834 ET) https://www.investopedia.com/terms/f/fixedannuity.asp. A restitution recipient can purchase a long-term annuity investment product from a reputable, nation-wide insurance firm. *Id.* The recipient gives the firm the lump sum restitution payment and in exchange the firm guarantees the recipient an amount of money each year equivalent to a certain percentage increase on the lump sum payment amount. *Id.*

a twenty-year period. *Id.* at 2-3, ECF No. 317-1. Dr. Bucheli did not recalculate Doe's losses in present value dollars using a discount rate commensurate with current long-term annuity rates, as the Court requested, nor did he help the Court by finding facts supporting an appropriate discount rate. *See generally id.*; Order Regarding the Discount Rate at 2, ECF No. 315.

Therefore, on August 23, 2025, pursuant to Federal Rule of Evidence 706(a), the Court appointed Matt Holt as an "expert on investing monetary awards for minors," ECF No. 323, and on September 18, 2025 ordered him to produce and submit to the Court and Parties a report detailing "(1) the appropriate methodology for determining discount rates and investment rates based on the typical, contemporary investment of a monetary award, and (2) his opinion as to what discount rate should be applied to future damages on the order of restitution in his case," ECF No. 328 at 1-2. Clements responded to the Court's Order Regarding the Discount Rate, maintaining his previous objection to the amount of restitution as "unreasonably speculative" and declaring that the method of determining "what discount/interest rate applies and Mr. Holts['s] Report is immaterial" as he objects to any amount of restitution. ECF No. 330 at 1.

Mr. Holt submitted his Rule 706 Expert Report on October 7, 2025 addressing the prudent investor rule and other fiduciary standards related to the contemporary investment methodologies and recommending a 3.0% discount rate be applied to this case. ECF No. 329 at 2-3, 5. In response to the Rule 706 Expert Report, the Government stated that it "stands by the pleadings, evidence, and testimony of economic expert, Dr. Bucheli" and requests "the Court impose the restitution in the amount determined by Dr. Bucheli." ECF No. 331 at 4.

## II. Legal Standard

### A. Restitution

Estrada pleaded guilty to, and a jury found Clements guilty of, offenses under Chapter 77

of Title 18 of the United States Code—specifically, 18 U.S.C. § 1590 as to Estrada, and 18 U.S.C.

§ 1591(a)(1) as to Clements. *See* Estrada J. at 1, ECF No. 277; Clements J. at 1, ECF No. 244.

Chapter 77 has a mandatory restitution provision that states, in relevant part:

> **(a)** Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalties authorized by law, the court shall order restitution for any offense under this chapter.
>
> **(b)(1)** The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses, as determined by the court under paragraph (3) of this subsection.
>
> **(2)** An order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A.
>
> **(3)** As used in this subsection, the term "full amount of the victim's losses" has the same meaning as provided in section 2259(c)(2) . . . .
>
> **(c)** As used in this section, the term "victim" means the individual harmed as a result of a crime under this chapter, including, in the case of a victim who is under 18 years of age, . . . the legal guardian of the victim or a representative of the victim's estate, or another family member, or any other person appointed as suitable by the court . . . .

18 U.S.C. § 1593.

> In turn, Section 2259(c)(2) defines "full amount of the victim's losses" to include
>
> any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim . . . including--
>
>> **(A)** medical services relating to physical, psychiatric, or psychological care;
>>
>> **(B)** physical and occupational therapy or rehabilitation;
>>
>> **(C)** necessary transportation, temporary housing, and child care expenses;

9

(D) lost income;

(E) reasonable attorneys' fees, as well as other costs incurred; and

(F) any other relevant losses incurred by the victim.

18 U.S.C. § 2259(c)(2).

Pursuant to 18 U.S.C. § 3664, disputes "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). Under this section, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A).

"[T]he determination of restitution is not an exact science and . . . the calculation of a loss need not be precise." *United States v. Kravchuk*, 335 F.3d 1147, 1157 (10th Cir. 2003) (affirming the amount of restitution awarded under an abuse of discretion standard). "A sentencing court may resolve restitution uncertainties 'with a view towards achieving fairness to the victim,' so long as it still makes a 'reasonable determination of appropriate restitution' rooted in a calculation of actual loss." *United States v. Gallant*, 537 F.3d 1202, 1252 (10th Cir. 2008) (quoting *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir. 1997)); *see also United States v. Serawop*, 505 F.3d 1112, 1123 (10th Cir. 2007) (noting that in the Tenth Circuit restitution is not criminal punishment but is based "in the field of compensation and remediation"). But "[s]peculation and rough justice are not permitted," and a district court must rely on evidence presented "with a view towards achieving fairness to the victim" when issuing a restitution order. *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015) (internal quotation marks and citations omitted).

Restitution may only be awarded for losses resulting from the offense for which the defendant or defendants were convicted. *United States v. West*, 646 F.3d 745, 751 (10th Cir. 2011) (citing *Hughey v. United States*, 495 U.S. 411, 413 (1990)). The defendant or defendants must be both the but-for and proximate cause of the victim's losses under 18 U.S.C. § 1593. *United States v. Anthony*, 942 F.3d 955, 966 (10th Cir. 2019). If more than one defendant "has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution." 18 U.S.C. § 3664(h).

## B. Discount Rate

The Supreme Court has held that "in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award." *Kelly*, 241 U.S. at 490. "The discount rate should be based on the rate of interest that would be earned on 'the best and safest investments'" and should "reflect[] the safest available investment." *Pfeifer*, 462 U.S. at 537-38 (quoting *Kelly*, 241 U.S. at 491). "[T]he present value calculation is to be made by the 'trier of fact'"—meaning the trier of fact is to select the discount rate. *See Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 341 (1988). A trial court adopting a discount rate derived from an estimated rate of return minus an estimated rate of inflation should not be reversed "if it adopts a rate between one and three percent and explains its choice." *Pfeifer*, 462 U.S. at 548-49.[3]

---

[3] The Court finds the lasting impact of this portion of *Pfeifer* odd. Discount rates change constantly according to the current rate of inflation and rates of return of the best and safest investments. It seems likely the *Pfiefer* Court meant that a trial court *at that time* should not be reversed if it settles on a discount rate of one to three percent and explains its choice. *Pfeifer*, 462 U.S. at 548-49. After several years there is no reason to adhere to set range of discount rates. This Court ultimately adopts a discount rate of 3.0%, *see infra* III.B.(3), but four decades after *Pfeifer* that is mere coincidence, just as four decades hence an appropriate discount rate is unknowable. Courts should calculate an appropriate discount rate at the time of judgement. *See Stokes v. United States*, 967 F.3d 1034, 1048 (10th Cir. 2020) (McHugh, J., concurring) (recommending the first step is to identify the best and safest investment available to the recipient, the second step is to identify the rate of return on that investment, and the third step is to calculate the discount rate by determining the difference between the rate of return and the rate of inflation)

Although the Supreme Court limited *Pfeifer* to cases under § 5(b) of the Longshoremen's and Harbor Worker's Compensation Act, its finding has been extended to many, if not most, restitution scenarios, including in Federal Torts Claims Acts in the Tenth Circuit. 462 U.S. at 547; *Stokes v. United States*, 967 F.3d 1034, 1043–44 (10th Cir. 2020); *see also United States v. Cienfuegos*, 462 F.3d 1160, 1169 (9th Cir. 2006) ("While calculation of future lost income must be based upon certain economic assumptions, the concepts and analysis involved are well-developed in federal law, and thus the district court is not without persuasive analogy for guidance.") (citing *Pfeifer*, 462 U.S. at 533–53); *United States v. Thompson*, No. CR-09-88-FVS, 2013 WL 12303241, at *4 (E.D. Wash. Mar. 11, 2013) (finding the government's use of a 4% discount rate on future lost income "is a reasonable estimate" under *Pfeifer* for an order of restitution pursuant to § 3664). Finally, when courts use a net discount rate, "the basis of the computation must be explained and supported by competent evidence." *Hull ex. rel. Hull v. United States*, 971 F.2d 1499, 1511 (10th Cir. 1992).

## III. Discussion

The Court first turns to the matter of restitution before addressing the discount rate. For the reasons stated below, the Court finds the Government has sufficiently proven the appropriate amount of restitution, but orders the Government recalculate restitution using a 3.0% discount rate.

### A. Restitution

The Government argues that the Court should order restitution in the amount of $4,930,172—the low end of the damages range estimated by Dr. Bucheli, *see* Damages Report at Cover Page, ECF No. 293-8—jointly and severally among Clements and Estrada, Mot. for Restitution at 5, ECF No. 282.

Dr. Bucheli's Damages Report calculates loss in three categories: (1) loss of earnings and employee benefits; (2) treatment and medical care; and (3) loss of enjoyment of life. *See generally* ECF No. 293-8. All three are permissible loss categories under § 2259(c)(2): "lost income," "medical services relating to physical, psychiatric, or psychological care," and "other relevant losses." The total loss calculated by Dr. Bucheli, reduced to present value using a 1.5% discount rate, is between $4,930,172 and $8,465,592. Damages Report at Cover page, ECF No. 293-8. The calculation is based in part on Dr. Alexander's Psychological Evaluation of Doe, which is also Government-provided evidence. *Id.* at Cover Page; *see generally* Psychological Evaluation, ECF No. 293-7.

Estrada argues that $4,930,172 is unreasonably speculative and/or excessive and is "[p]lainly [r]etributive." Estrada Restitution Resp. at 3, ECF No. 301. Estrada argues that "it is not clear whether [Dr. Alexander] was able to disassociate [Doe's] prior harms and/or already-existing mental health issues that may have predated the offense from his report." *Id.* She argues that the loss range—$4,930,172 to $8,465,592—is unreasonable and demonstrates the speculative nature of the estimate. *Id.* She further argues that Dr. Bucheli's loss of earnings and employee benefits figures assume that Doe graduates from high school (at a minimum), but there is no evidence that Dr. Bucheli personally interviewed Doe to determine whether she wants to or is capable of graduating high school. *Id.* She argues that the $4,930,172 request "is tantamount to a windfall for the victim, and that is contrary to law." *Id.* at 4 (citing *United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018)). She further claims that the retributive nature of the request is evidenced by the fact that both Defendants have received life sentences and are indigent, and therefore neither of them can possibly satisfy such an award. *Id.* (citing *United States v. Patty*, 992 F.2d 1045, 1052

(10th Cir. 1993)).[4] Finally, Estrada asserts that "the Government's insistence in seeking over four million dollars from each Defendant is undoubtedly punitive, as it will drain already very limited funds from their inmate accounts." *Id.* at 5.

Clements likewise asserts that the $4,930,172 request is unreasonably speculative, Clements Restitution Resp. at 1, ECF No. 302, but he does not expound on the argument, *see id.*[5]

In its Response to the Order Regarding the Discount Rate, the Government increased its total restitution request by $3,911.99 to $4,934,083.99 based on the amounts in Defendant Estrada's PIR Addendum: (1) $2,170 to reimburse Jane Doe's stepmother, L.M., for Court-ordered fees paid to Jane Doe's Court-appointed Guardian Ad Litem (GAL), A.M., to cover 65% of A.M.'s incurred costs while investigating whether L.M. and Jane Doe's stepfather should receive emergency and full custody of Jane Doe after Jane Doe ran away from Defendant Estrada's home "due to the circumstances of the instant offense;" (2) $437.96 to reimburse A.M., representing the remaining 35% of fees owed to A.M. by Defendant Estrada for the same investigation; and (3) $1,304.03 owed to Medicaid based on payments made to Presbyterian Health "for behavioral

---

[4]    To the extent that Estrada is arguing that the Court should consider Defendants' ability to pay when ordering restitution under 18 U.S.C. § 1593, the Court rejects the argument. Restitution under §1593 is mandatory and the Court's "order of restitution . . . shall direct the defendant to pay the victim . . . the full amount of the victim's losses . . . ." 18 U.S.C. § 1593(b)(1). Furthermore, 18 U.S.C. § 3664, which governs restitution under Chapter 77 offenses, mandates that courts order restitution for the full amount of victim's losses "without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A); *see United States v. Johnson*, 183 F.3d 1175, 1179 (10th Cir. 1999) (Section 3664(f)(1)(A) requires "federal district courts to order restitution to the victim . . . regardless of the defendant's ability to pay.").

[5]    Both Defendants appear to misunderstand the government's restitution request. Defendant Estrada objected to a restitution amount of $9,860,344, apparently because she believed the Government requested $4,930,172 from each defendant. Estrada Restitution Resp. at 1, ECF No. 301. Joint and several liability means instead that the Government requested the right to obtain payment of the full amount, $4,930,172, from either Defendant Estrada or Defendant Clements, but not both. Defendant Clements filed a Response which made same the mistake. ECF No. 302 at 1. Both Defendants, however, object to the lower amount as well. Estrada Restitution Resp. at 1, ECF No. 301; Clements Restitution Resp. at 1, ECF No. 302.

14

health and medical services for Jane Doe." Resp. to Order Regarding the Discount Rate at 2-3, ECF No. 317; ECF No. 231 at 5.

Defendants maintain their objections regardless of the increased request. Def.'s Reply to Government's Resp. at 1, ECF No. 319; Def.'s Resp. to Government's Resp. at 1, ECF No. 321.

The Court discusses the three restitution requests based on the Damages Report before addressing the restitution requests based on the Addendum to Estrada's PIR.

### (1) *Loss of earnings and employee benefits*

First, Dr. Bucheli calculated Doe's estimated loss of earnings and employee benefits to age 67—the age she will be entitled to full social security benefits—using two scenarios. *See* Damages Report at 1-4, ECF No. 293-8. Scenario 1 assumes Doe graduates from high school. *See id.* at 2-3. Under Scenario 1, Doe is projected to earn $3,518,969 in cumulative wages and benefits through age 67. *Id.* at 11. Scenario 2 assumes Doe obtains an associate's degree. *See id.* at 5-6. Under Scenario 2, Doe is projected to earn $4,758,725 in cumulative wages and benefits through age 67. *Id.* at 13.

Relying on the Psychological Evaluation, Dr. Bucheli then calculated an "offset" scenario to determine lost wages. *See id.* 4-5. The "offset" scenario assumes that, because of Defendants' offenses, Doe (1) will not graduate high school and (2) has a 34.19% probability of employment relative to people without disabilities. *See id.* In the "offset" scenario, Dr. Bucheli projected that Doe would earn $946,454 in cumulative wages and benefits through age 67. *Id.* at 15.

Dr. Bucheli next calculated the amount of lost wages and benefits for Doe by age 67 by subtracting the "offset" figure from Scenarios 1 and 2. *See id.* at 4-5. Thus, for Scenario 1, the estimated loss in wages and benefits is $2,572,515. *Id.* at 5. For Scenario 2, the estimated loss in wages and benefits is $3,812,271. *Id.*

15

To establish both Scenario 1 and 2, the Government must prove by a preponderance of the evidence that but for Defendants' offenses Doe would have graduated from high school and, for Scenario 2, that she would have otherwise earned an associate's degree. 18 U.S.C. § 3664(e). The Court therefore turns to Dr. Alexander's Psychological Evaluation to determine if the Government establishes, by a preponderance of the evidence, that Doe would have graduated from high school or earned an associate's degree but for the Defendants' offenses.

On one hand, Dr. Alexander notes that "it is reasonable to infer that Doe sustained mild-to moderate forms of neglect, if only academically, during her formative years," which predate Defendants' actions. Psychological Evaluation at 13, ECF No. 293-7 (quotation modified). And Dr. Alexander notes that Doe has "an underlying learning disorder," had "to repeat kindergarten," and "qualified for Title I reading support in earlier grades." *Id.* at 2, 14.

On the other hand, Dr. Alexander notes that although Doe was provided with reading support for a brief period, she never had an Individualized Education Program at school, indicating "her teachers believe[d] [she] ha[d] better potential than she demonstrated" at a young age. *Id.* at 11. The Court does not believe these early issues necessarily indicate Doe would not have graduated high school even had she not been victimized by the Defendants. Furthermore, Dr. Alexander found that Doe's scores on tests assessing her cognitive abilities are consistent with inattentiveness stemming from Post-traumatic Stress Disorder resulting from her ordeal rather than "inherent problems with her memory operations." *Id.* Finally, Dr. Alexander opined that Doe's current impediments to high school graduation, including running away and experimenting with alcohol and drugs, are not age-typical experimentation, but rather reflect her "trauma and . . . internal pain from the physical and sexual abuse she endured." *Id.* at 14. Dr. Alexander concluded that "[g]iven her psychological issues, it makes sense that [Doe] does not prioritize her academics"

16

and external help is required "to help her graduate [from high school] or at least obtain a GED." *Id.*

Given the clear link between Doe's current academic impediments and the offenses, and the relatively mild issues predating the offenses, the Court finds that the Government has established by a preponderance of the evidence that Doe would have graduated high school but for the offenses for which Defendants were found guilty. The Court does not find, however, that Doe would have obtained an associate's degree. As that is the case, the Court accepts Dr. Bucheli's use of Scenario 1 and the offset based on Doe's disabling psychological injuries.

The offenses for which Defendants were convicted are found to be the but-for and proximate cause of the losses incurred by the victim due to lost income. Although Dr. Bucheli found the loss of wages and benefits to be $2,572,515, the Court orders the Government to recalculate the dollar amount using a 3.0% discount rate, *see infra*, III.C.

**(2)** *Treatment and medical care*

Second, the Government submits Dr. Alexander's evaluation to establish that Doe has required and will require ongoing medical treatment due to the offenses for which Defendants were convicted. *See generally* Psychological Evaluation, ECF No. 293-7. Specifically, Dr. Alexander finds that the offenses took a physical and emotional toll on Doe, "directly resulting in her post-traumatic stress symptomatology and her need for ongoing mental health treatment." *Id.* at 13. These events have impacted her psychological and social development and Doe thus requires "fairly intensive mental health and support services." *Id.* The Court finds this evaluation establishes by a preponderance of the evidence that the offenses for which Defendants were convicted were the but-for and proximate cause of the treatment and medical care Doe has and will likely require.

17

Dr. Bucheli estimates that the cumulative healthcare costs Doe has and will incur because of Defendants' offenses are $18,969 from ages 11 to 17 and between $104,722 and $166,420 from ages 18 through 81. Damages Report at 5-6, 16-18, ECF No. 293-8. In explaining the range of future healthcare costs, Dr. Bucheli states:

> To project the annual incremental healthcare costs for [Doe's] adult life, I use a growth factor of 3.12%, which is the 2004-2023 average inflation rate for medical care, and a discount factor of 1.5%. No evidence was found in the literature on differential healthcare costs beyond age 65, so I calculate a range to account for this limitation. The lower bound of this range assumes no differential starting at age 65, while the upper bound assumes that the differential is the same as in the 18-64 age group.

*Id.* at 6 (citation omitted). Because there is no evidence on differential healthcare costs beyond age 65, the Court will use the lower bound of the range.

Accordingly, the Court finds that the Government has proven by a preponderance of the evidence that the health care costs incurred and reasonably expected to be incurred by Doe because of the Defendants' offenses are $18,969 in child healthcare costs and $104,722 in future healthcare costs based on a 1.5% discount rate. The Court, however, orders the Government to recalculate the dollar amount of future healthcare costs using a 3.0% discount rate, *see infra*, III.C.

**(3)** *Reduction in enjoyment of life*

Third, the Government submits Dr. Alexander's Evaluation to establish that Doe's enjoyment of life will be reduced due to the offenses for which Defendants were convicted. *See* Damages Report at 7, ECF No. 293-8. Dr. Alexander lists many detrimental consequences stemming from the offenses, including the physical and emotional toll on Doe, the negative impact on her psychological and social development, ongoing internal pain, and negative impacts on potential life milestones like dating, exploring sex, having children, and trusting adults with her children if she has children. Psychological Evaluation at 13-15, ECF No. 293-7. Furthermore, he

notes other lasting problems likely to stem from the offenses, including wondering whether the recording equipment found in Clements's room was used while she was assaulted, the past and potential future media coverage of the case, and, most consequentially, the fact that her own mother facilitated her abuse. *Id.* at 13-14. The Court finds the Government has proven by a preponderance of the evidence that the offenses for which Defendants were found guilty are the but-for and proximate cause of Defendant's reduction in enjoyment of life. Doe is now in a more stable home and no longer has contact with Defendants. *See id.* at 6. The Court is encouraged that, with the correct treatment and guidance, Doe can overcome many of her struggles.

Dr. Bucheli calculated Doe's reduction in enjoyment of life due to Defendants' offenses to be between $2,333,966 and $4,467,932. Damages Report at 8, 20-22. He began with a base estimated value of life at $9.2 million (in present value dollars). *Id.* at 7 (citing Ted R. Miller, *Hedonic Damages: Were the Body Blows to the Golden Goose Well-Founded?*, J. of Forensic Econ., 20(2), 137‑153 (2008)). He then assumed, based on Dr. Alexander's Psychological Evaluation, that Defendants' offenses caused a 25% to 50% reduction in Doe's "ability to lead a normal life through the end of her life expectancy." *Id.* Using a 2.81% growth factor and a 1.5% discount rate to convert the estimates to present value dollars, Dr. Bucheli found applying a 25% reduction to an estimated $9.2 million value of life results in a $2,333,966 cumulative loss over the course of Doe's life expectancy. *Id.* at 7, 20.[6]

---

[6] The Court used Dr. Bucheli's methodology for calculating a Reduction in Value of Life (25% Impairment), *see* Damages Report at 7, ECF No. 293-8, but was unable to replicate Dr. Bucheli's calculations in Table 6, *id.* at 19-20. The Court believes Dr. Bucheli made an error. Dr. Bucheli describes his method as using a "growth factor" of 2.81% and a "discount factor" of 1.5% and said he used a "similar approach as above" (the Court assumes Dr. Bucheli is referring to his calculations for Lost Wages and Future Incremental Healthcare Costs, which the Court was able to replicate). *Id.* at 7. With a higher growth factor than discount factor, there should be a gradual *increase* in present value year-on-year, as in Table 5 for Future Incremental Healthcare Costs. *See id.* at 6, 17-18. Instead, in Table 6 the 25% Impairment present value *decreases* year-on-year from 2025 to 2089. *See id.* at 19-20.

The Government has requested restitution based on a 25% Impairment to the Reduction in Value of Life. Mot. for Restitution at 5, 7, ECF No. 282. The Court finds that the Government has proven by a preponderance of the evidence that Defendants' offenses will cause at least a 25% reduction in Doe's enjoyment of life. The Court finds that applying a 25% reduction to Doe's estimated $9.2 million value of life is the appropriate amount of restitution owed for loss of enjoyment due to Defendants' offenses. Although Dr. Bucheli found the restitution owed to be $2,233,966, the Court orders the Government to recalculate the dollar amount using a 3.0% discount rate, *see infra*, III.C.

**(4)** *Restitution based on the presentence report*

Finally, the Government requests two types of restitution based on the Addendum to Defendant Estrada's PIR. *See* Gov't's Resp. to Order Regarding the Discount Rate at 2-4, ECF No. 317; ECF No. 231 at 5-6. First, the Government requests $2,170 for L.M., Doe's stepmother, and $437.96 for A.M., the GAL, based on A.M.'s custody investigation precipitated by the Defendants' offenses. Resp. to Order Regarding the Discount Rate at 2-3, ECF No. 317; Addendum to PIR as to Karyn L. Estrada at 5, ECF No. 231. Second, in addition to the above Treatment and Medical Care costs estimated by Dr. Bucheli, the Government requests $1,304.03 based on medical expenses incurred in treating Doe's "suicidal ideation" and/or "major depressive disorder." Resp. to Order Regarding the Discount Rate at 2-3, ECF No. 317; Addendum to PIR as

---

The Court attempted to replicate Table 6 and found it could approach similar numbers (within 1.9%) by applying a 0.0281% growth rate and a 0.15% discount rate to Dr. Bucheli's methodology. Therefore, the Court believes Dr. Bucheli's original calculations in Table 6 are wrong due to applying growth and discount rates off by a factor of 100 and 10, respectively. The Court recognizes these can be common mistakes when working in spreadsheets and does not find this error undermines its confidence in the remainder of Dr. Bucheli's findings with respect to restitution.

Applying a growth rate of 2.81% and a discount rate of 1.5% and using Dr. Bucheli's described methodology, the Court finds a 25% Impairment to Reduction in Life is $3,585,460.49. The Court, however, uses the amount originally requested by the Government, $2,333,966. *See* Mot. for Restitution at 5-8, ECF No. 282.

to Karyn L. Estrada at 5-6, ECF No. 231. The Court finds that the addendum to Defendant Estrada's presentence investigation report suffices to establish the requested amounts by a preponderance of the evidence.

As to the first category, the Court finds that although the money spent by L.M. and A.M. was due to Defendants' offenses, neither amount is the victim's loss and therefore neither can be ordered as restitution. Under Chapter 77, only the victim is entitled to mandatory restitution based on losses caused by a defendant's offense. 18 U.S.C. § 1593(b)(1) ("The order of restitution under this section shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses . . . ."). And "'victim' means the individual harmed as a result of a crime under [Chapter 77]." *Id.* § 1593(c). Neither A.M. nor L.M. qualify as victims here. The money paid to A.M. by L.M. is a loss for L.M. and the money spent by A.M. and not reimbursed by Defendant Estrada is a loss for A.M. L.M. and A.M. may have recourse to other legal means to recover their funds from one or both Defendants, but neither is entitled to restitution.

The payment for medical services required due to Defendants' offenses, however, is both a victim's loss and falls under a permissible loss category per § 2259(c)(2): "medical services relating to physical, psychiatric, or psychological care." The monetary amount is fixed based on services rendered. Addendum to PIR as to Karyn L. Estrada at 5, ECF No. 231; *see* 18 U.S.C. § 3664(a). The amount has the same status as the costs incurred by Doe from age 11 to 17. *See* Damages Report at 5, ECF No. 293-8. And the Court finds the Government, through the Psychological Evaluation conducted by Dr. Alexander, has established by a preponderance of the evidence that the medical care was required by the offenses for which Defendants were convicted. *See* Psychological Evaluation at 3, ECF No. 293-7. Therefore, the Court awards as part of the full

21

Restitution $1,304.03 for medical services rendered to the victim due to the offenses for which Defendants were convicted.

## B. Discount Rate

The Court now turns to selecting the appropriate discount rate by which to calculate the present value of restitution. In *Pfeifer*, the Supreme Court encouraged courts not to turn "[t]he average accident trial . . . into a graduate seminar on economic forecasting." 462 U.S. at 548 (quoting *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 39 (2nd Cir. 1980) (noting that forecasts of future price inflation are "too unreliable to be useful in many cases," and encouraging courts to use a more straightforward approach to estimating inflation)). The *Pfeifer* court found a discount rate of one to three percent should not be overturned so long as the court "explains its choice," and mandated that District Courts "must make a deliberate choice" in selecting a discount rate. *Id.* at 548, 552-53.[7]

These charges, combined with the Supreme Court's mandate that discount rates should reflect "the best and safest investments" and the "safest available investment," led many courts to base discount rates on U.S. Treasury Bills, finding government-backed securities a safe investment that conformed with *Pfeifer*. *Id.* at 537-38 (internal quotation marks and citation omitted); *see, e.g.*, *Rhodes v. Guiberson Oil Tools*, 82 F.3d 615, 622 (5th Cir. 1996) (holding the District Court appropriately selected the U.S. Treasury Bill market rate of 7.0% as the "safest available

---

[7]    Although *Pfeifer* was confined to matters under § 5(b) of the Longshoremen's and Harbor Worker's Compensation Act, 462 U.S. at 547, courts have generally turned to *Pfeifer* as controlling or persuasive authority for all manner of restitution cases. *See, e.g.*, *Stokes v. United States*, 967 F.3d 1034, 1044 (10th Cir. 2020) (finding *Pfeifer* controlling in Federal Tort Claims Act cases); *United States v. Cienfuegos*, 462 F.3d 1160, 1169 (9th Cir. 2006) (remanding to the district court in part because the court failed to look to *Pfeifer* as persuasive guidance when calculating restitution in a criminal matter). Here, as in *Stokes*, the Government has cited favorably to *Pfeifer* and has not argued it is inapplicable. Resp. to Rule 706 Expert Report at 4, ECF No. 331; *Stokes*, 967 F.3d at 1044. The Court therefore proceeds under the *Pfeifer* framework.

investment," but impermissibly failed to subtract the rate of inflation from 7.0% to find a discount rate); *Denton v. United States*, No. 87-2536-V, 1990 WL 126927, at *2 (D. Kan. Aug. 22, 1990) (selecting a 4.84% discount rate by subtracting the 1.5% inflation rate reported by the Bureau of Labor Statistics from the 6.34% U.S. Treasury Bill rate); *United States v. Schenck*, No. CR 20-19, 2023 WL 3019959, at *13 n.51 (E.D. La. Apr. 20, 2023), *appeal dismissed*, No. 22-30655, 2024 WL 2369447 (5th Cir. May 23, 2024) (finding a 2.0% discount rate (1) conformed with the U.S. Treasury Bill rate of 4.5% minus the 2.0% rate of inflation as calculated from the Consumer Price Index for the previous ten years, (2) lay within the *Pfeifer* range of 1.0 to 3.0%, and (3) was in line with the Office of Management and Budget's forecasted "real discount rate" for the next 20- to 30-year period).

But, as noted in *Stokes*, "*Pfeifer* makes no mention of which investment vehicle is appropriate, as long as that vehicle is a safe investment." 967 F.3d at 1044 n.9 (noting that the district court incorrectly "implied that *Pfeifer* requires courts to use the 'Treasury Bill rate' when calculating interest rates").[8, 9] *Pfeifer* did not mandate the use of U.S. Treasury Bills, it mandated a discount rate based on the "best and safest investments" and the "safest available investment"— and mandated that courts explain why they selected that discount rate. 462 U.S. at 537-38, 549

---

[8]    Dr. Bucheli appears to make a similar error, explaining that "U.S. Treasury securities . . . are widely regarded as the closest to a risk-free investment . . . [and] [t]he Supreme Court approved this approach in [*Pfeifer*, 462 U.S. at 549-50]." Addendum to the Damages Report at 1, ECF No. 317-1. The cited pages in *Pfeifer*, however, do not support this assertion. They (1) include the opinion that "a trial court adopting such an approach . . . should [not] be reversed if it adopts a rate between one and three percent and explains its choice" and (2) discuss why the Supreme Court rejects the Third Circuit's advocacy for mandatory use of the "offset method" (which results in a zero percent discount rate). 462 U.S. at 549-50. The "approach" above is subtracting the rate of inflation from a market interest rate and does not specify on what investment product the market interest rate should be based. *Id.* at 548.

[9]    Of note, despite its emphasis on safe investments, *Pfeifer* itself did not reject the lower court's selected discount rate because it rested on an immoderately risky investment option, but rather because the lower court improperly bound itself by the state law governing discount rates in negligence cases. 462 U.S. at 547 ("The fact that Pennsylvania has adopted the total offset rule for all negligence cases in that forum is therefore not of controlling importance in this case.").

23

(internal quotation marks and citation omitted); *see also Stokes*, 967 F.3d at 1044 ("Because the district court did not state the basis for its chosen discount rate, we cannot determine whether this rate is an error."). Furthermore, since cases before *Pfiefer* rested on many different investment options, it is unlikely *Pfeifer* closed off every investment benchmark except U.S. Treasury Bills without mentioning U.S. Treasury Bills. *See, e.g.*, *Hoskie v. United States*, 666 F.2d 1353, 1355-56 (10th Cir. 1981) (holding a 9.5% discount rate reasonable because triple A-rated corporate bonds were a "reasonably safe long-term investment available to the average person" and the trial court applied 6% wage inflation prior to applying the discount rate); *In re Jones*, 480 F.2d 11, 29 (5th Cir. 1973) (holding a 4% discount rate reasonable based on a fixed payment annuity of 4.5%); *O'Connor v. United States*, 269 F.2d 578, 585 (2d Cir. 1959) (holding a 3.5% discount rate based on savings accounts yielding between 3.25% and 3.5% reasonable and further holding any rate between 3% and 4.5% not wrong as a matter of law).

Courts since *Pfeifer* have also turned to other investment products and benchmarks when determining the best and safest available investments. *See, e.g.*, *Stokes v. United States ex rel. Indian Health Serv.*, No. CIV-17-0186-JH, 2021 WL 3909681, at *1–3 (E.D. Okla. Mar. 12, 2021) (finding high grade municipal bonds a safe investment and, since the bond rate at the time of trial was 2.3 to 3.0% and the applicable rate of inflation 2.62 to 2.875%, 0.0% was a reasonable discount rate); *United States v. Thompson*, No. CR-09-88-FVS, 2013 WL 12303241, at *4 (E.D. Wash. Mar. 11, 2013) (using the nominal interest rate in Canada).

Use of the U.S. Treasury Bill rate appears to be either a simplistic crutch based on the mistaken impression that *Pfeifer* requires it, *see Stokes*, 967 F.3d at 1044 n.9; Addendum to the Damages Report at 1, ECF No. 317-1, or a reflection of previous investment patterns when Treasury Bills may have been preferred to other investment options, *see, e.g.*, William P. Jennings,

24

*Selection of an Appropriate Discount Rate in Wrongful Death and Personal Injury Cases*, 14 J. Contemp. L. 195, 203–04 (1988) ("[M]any courts and commentators suggest the use of a 'safe investment' standard which ties the discount rate to the rate offered on a particular debt instrument . . . most frequently, government securities.").

The Court therefore adheres to the Supreme Court's guidance in *Pfeifer* that courts must make "a deliberate choice" to use a discount rate based on the best and safest available investment, 462 U.S. at 537-38, 552-53, and the Tenth Circuit mandate in *Hull* that "[w]hether a net discount rate is used or actual investment interest and inflation figures are used, the basis of the computation must be explained and supported by competent evidence," 971 F.2d at 1511.

Here, the Government appears to have selected a U.S. Treasury Bill rate based on the actions of other courts and not whether such rate is the best and safest one available to the plaintiff. *See* Addendum to the Damages Report at 1-2, ECF No. 317. The Court finds that, in accordance with the Rule 706 Expert Report that the current best and safest investment available to minor awardees of restitution is a diversified portfolio conservatively returning an inflation-adjusted rate of 3.0%, the appropriate discount rate in this case is 3.0%. Rule 706 Expert Report at 3, ECF No. 329.

### (1) *Initial Government Report and Order for Rule 706 Expert Report*

The Government initially used a discount rate of 1.5% based on U.S. Treasury Bills, Damages Report at 2, ECF No. 293-8, but the Court was "not convinced that the U.S. Treasury Bill rates reflect 'the rate of interest that would be earned on 'the best and safest investments,'" Order Regarding the Discount Rate at 2, ECF No. 315 (quoting *Pfeifer*, 462 U.S. at 537 (quoting *Kelly*, 241 U.S. at 491)). Based on its impression "that an annuity is a better investment because it offers a higher interest rate than a U.S. Treasury Bill, and is comparably safe," the Court ordered

the Government and Dr. Bucheli to submit an addendum to the Damages Report recalculating restitution "using a discount rate that is commensurate with current long-term annuity rates." Order Regarding the Discount Rate at 2, ECF No. 315.

Instead of complying with the Court's orders, Dr. Bucheli submitted an addendum to his Damages Report explaining why he used a 1.5% discount rate and, unnecessarily, how discount rates work. ECF No. 317-1 at 1-2. Dr. Bucheli explained that he picked 1.5% because U.S. Treasuries are "widely regarded as the closest to a risk-free investment," the "Supreme Court approved this approach in [*Pfeifer*]," other courts have used similar "below-market" discount rates, and "other courts have regarded discount rates in the 1-2 percent range as the benchmark for compensation." *Id.* In citing cases, Dr. Bucheli goes far beyond his area of expertise. Dr. Bucheli is an expert on restitution and, the Court must assume since Dr. Bucheli provided no basis to believe, on deriving discount rates through facts. He is not an expert in law, nor in the legal standards requiring certain discount rates.[10] The government and Dr. Bucheli provided the Court no facts or competent evidence in support of their rate. *Id.* They merely cited to other cases. *Id.* This Court has an obligation to base the discount rate on adequate factual evidence, not legal argument. *Hull*, 971 F.2d at 1511.

Due to Dr. Bucheli's failure to find the restitution amount in accordance with annuity rates or rates reflecting typical contemporary investments by restitution recipients, and pursuant to its

---

[10] For example, Dr. Bucheli cites to *Rhodes* when discussing the use of "below-market" discount rates. Addendum to Damages Report at 1, ECF No. 317-1. It appears, however, that whereas Dr. Bucheli attempts to use *Rhodes* to support a low discount rate of one to three percent, *Rhodes* instead uses the term "below-market" to mean an inflation-adjusted discount rate. *See Rhodes*, 82 F.3d at 622-23 ("[B]ecause this figure will not represent a fixed amount, and will be subject to the effects of inflation, the factfinder must apply a below-market discount rate to discount the future income stream amount to present value."). The district court in that case used a market rate of 7.0%, representing the U.S. Treasury Bill market rate over a 7.5-year period between 1986 and 1992, but failed to use the rate of inflation to find the discount rate. *Id.* at 622. As noted above, Dr. Bucheli is not a legal expert, and the Court disregards his legal analysis.

authority under Federal Rule of Evidence 706, the Court appointed Matt Holt to serve as an expert in this matter based on his experience "investing monetary awards for minors." Order Setting Continuation of Restitution Hr'g, ECF No. 323. The Court requested from Mr. Holt a report detailing "(1) the appropriate methodology for determining discount rates and investment rates based on the typical, contemporary investment of a monetary award, and (2) his opinion as to what discount rate should be applied to future damages on the order of restitution in this case." Order for Report at 1-2, ECF No. 328. In accordance with the Court's Order for Report, Mr. Holt submitted a report based on his "legal and practical experience with investment practices" as "governed by the Prudent Investor Rule and related fiduciary standards." ECF No. 329 at 1. Mr. Holt suggested two "defensible" discount rate options: a 3.0% real discount rate based on contemporary investment practices and 2.65% based on 30-year Treasury Inflation-Protected Securities ("TIPS"). *Id.* at 1-5.

### (2) *Rule 706 Expert Report*

Mr. Holt reported that "[a]wards made to minors are typically invested in diversified portfolios, in accordance with applicable fiduciary duties." *Id.* at 2. Trustees in New Mexico, for example, are required to diversify portfolios.[11] *Id.* (citing N.M. Stat. Ann. § 45-7-604). Further, "[a] strictly Treasury-only portfolio, while secure, may not satisfy the fiduciary's duty to balance safety with reasonable returns." *Id.* Therefore, contemporary portfolios for a minor's award are typically invested half in diversified equity exchanged-traded funds, forty percent in investment grade bonds (including U.S. Treasury Bills), and ten percent in cash or cash equivalents. *Id.* at 3. Based on historical returns adjusted for inflation, Mr. Holt estimated an expected real return of

---

[11]     Diversification reduces risk in investment portfolios by spreading investments across several categories so that a loss in any one category has a minimal impact on the overall portfolio. *See id.* at 2-3 (citations omitted).

27

3.225%, which, rounded down to 3.0%, "would reasonably reflect prudent fiduciary investing under current market conditions." *Id.*[12]

Alternatively, for an investor focused only on U.S. Treasury Bills, Mr. Holt reported the contemporary best option for the investment of a minor's award is in TIPS because they "pay interest on a principal amount that adjusts with the Consumer Price Index, . . . offering protection against inflation while guaranteeing no loss of original principal at maturity." *Id.* at 3-4. As of August 21, 2025, a 30-year TIPS returns 2.65%. *Id.* at 4. Mr. Holt opined that using the 2.65% discount rate based on TIPS "conforms to the *Pfeifer* directive when interpreted as emphasizing safety and inflation protection, even at the expense of higher yield." *Id.*

Under the *Pfeifer* framework, Mr. Holt recommends the TIPS-based 2.65% discount rate be applied in this case if the primary goal is "best among the safest investments;" however, if "a balanced standard incorporating both safety and return" or "the safest among the best-performing investments" is the priority, then a 3.0% discount rate based on a diversified portfolio is reasonable under *Pfeifer*. *Id.* at 4-5. *Pfeifer* is not clear which interpretation should take priority as it uses the phrases "best and safest investments" and "safest available investment" in quick succession. 462 U.S. at 537-38. Overall, based on "the Court's emphasis on conservatorship principles," "the fiduciary context," and as the option "most consistent with both legal and economic logic," Mr. Holt recommends using "a balanced standard incorporating both safety and return," giving a 3.0% discount rate. Rule 706 Expert Report at 4-5, ECF No. 329. The Court includes Mr. Holt's report as an appendix to this Opinion, as his report is straightforward and will not risk turning this Opinion

---

[12]    In calculating a 3.225% return, Mr. Holt assumed all bond holdings would be 1.5% U.S. Treasury Bills based on Dr. Bucheli's report. *Id.* at 3 n.2.

or others relying on it into "graduate seminar[s] on economic forecasting." *Pfeifer*, 462 U.S. at 548; Appendix 1, ECF No. 335-1.

Clements filed a Response to the Court's Order for Report which, based on counsels' responses in the Status Conference after Mr. Holt's appointment, the Court interprets as a Response to the Rule 706 Expert Report. *See* Clerk's Min. for Hr'g of Sep. 17, 2025, ECF No. 327. In it, Clements reiterates his previous objections to the restitution amount as "unreasonable," "not supported by the facts of the case or law," and "unreasonably speculative." ECF No. 330 at 1. Clements requests denial of both the full amount of restitution and denial of "the Government's Response to the Order Regarding Discount Rate to Apply to Restitution Order [ECF No. 317]." *Id.* Clements also insists that it is "immaterial" how the Court determines what discount rates applies and that Mr. Holt's report is also "immaterial" since Defendant objects to any restitution. *Id.*

The Government stands by Dr. Bucheli's report and testimony and advocates for a 1.5% discount rate. *See* Resp. to Rule 706 Expert Report at 4, ECF No. 331.

Thus, the question for the Court is what discount rate reflects the rate of interest that would be earned on the best and safest investments currently available to Doe.

### (3) *The Court adopts the Rule 706 Expert Report's reasoning and selects a discount rate of 3.0%*

Based on *Pfeifer*, the Court is mindful that the discount rate should reflect both the best and safest investments available to this recipient, Doe, and that it "should not reflect the market's premium for investors who are willing to accept some risk of default," meaning investors who are willing to risk losing their entire investment. *Pfeifer*, 462 U.S. at 537. The Court must also explain

its choice. *Hull*, 971 F.2d at 1511 ("[T]he basis of the computation must be explained and supported by competent evidence.").

The Court therefore follows the framework in the concurrence to *Stokes v. United States* in selecting a discount rate. 967 F.3d 1034, 1048 (10th Cir. 2020) (McHugh, J., concurring). The first step is to identify the best and safest investment available to the recipient. *See id.* The second step is to identify the rate of return on that investment. *Id.* And the third step is to calculate the discount rate by determining the difference between the rate of return and the rate of inflation. *See id.*

As to step one, based on the evidence submitted by the Parties and Mr. Holt, the Court finds that a diversified portfolio investment holding exchanged-traded funds, bonds, and cash or cash-equivalents, like that identified by Mr. Holt, is the best and safest investment available to Doe. Per Mr. Holt's Rule 706 Expert Report, awards to minors are typically invested based on the fiduciary duties of the trustee, which require diversified portfolios to balance minimization of risk and rate of return, making them the safest and best available option. Rule 706 Expert Report at 2, ECF No. 329.

Conversely, the Government ignores the modifier "best" and makes no argument about whether the U.S. Treasury Bill rate underpinning its discount rate is the "safest available investment" or "best and safest investment[]." *See generally* Damages Report, ECF No. 293-8; Addendum to the Damages Report, ECF No. 317-1; *Pfeifer*, 462 U.S. at 537-38 (internal quotation marks and citation omitted). Instead, the government appears focused on the "risk-free stream of future income to replace . . . lost wages" portion of *Pfeifer*, asserting that "U.S. Treasury securities . . . are widely regarded as the closest to a risk-free investment" and incorrectly insinuating "[t]he Supreme Court approved th[e] [U.S. Treasury Bill] approach in [*Pfeifer*]." 462 U.S. at 537;

30

Addendum to the Damages Report at 1, ECF No. 317-1.[13] As to whether U.S. Treasury Bills are the "best" option available, the Government at most only offers that "other courts . . . have also used similar below-market discount rates" and "other courts have regarded discount rates in the 1-2 percent range as the benchmark for compensation." Addendum to the Damages Report at 1-2, ECF No. 317-1. The Court finds this unconvincing. Even if the Government had explained its reasoning, Mr. Holt identifies a better commensurately safe available investment in TIPS, meaning the Government discount rate should be at least 2.65%.

Dr. Bucheli is right that *Pfiefer* "not[es] that a [discount] rate between one and three percent will not be reversed if the choice is explained[,]" *id.* at 2, but the Court believes the Government has not sufficiently explained whether 1.5% is in line with the "best and safest investments" or the "safest available investment[,]" 462 U.S. at 537-38 (internal quotation marks and citation omitted). Therefore, the Court cannot adopt the Government's reasoning without falling foul of the *Pfeifer* requirement to "explain its choice," 462 U.S. at 549, and the *Hull* requirement to support and explain "the basis of the computation" with "competent evidence," 971 F.2d at 1511.

Overall, Mr. Holt, not the Government, identified the best and safest investment option available to minor Doe. Therefore, as to step one, the Court adopts a diversified portfolio as the best and safest available investment option in this circumstance. *See Stokes*, 967 F.3d at 1048 (holding courts "must make specific findings about the current availability of a safe investment or safe set of investments"); *Hull*, 971 F.2d at 1511–12 (holding the district court permissibly adopted the plaintiff's expert's methodology).

---

[13] Even if, arguendo, the Government is correct that the awardee is "entitled to a risk-free stream of future income to replace [her] *lost wages*," 462 U.S. at 537 (emphasis added), and a 1.5% discount rate based on U.S. Treasury Bills is "risk-free" and conforms with the "best and safest" and "safest available" investment, the Government has not explained why the 1.5% discount rate should extend beyond Lost Wages to its restitution requests for Treatment and Medical Care, Reduction in Value of Life, and Medical Reimbursement.

As for step two, identify the rate of return, and step three, determine the difference between the rate of return and the inflation rate, the Court finds the inflation-adjusted rate of return of 3.0% identified by Mr. Holt for diversified portfolios in these circumstances completes both steps. *Stokes*, 967 F.3d at 1048; *Hull*, 971 F.2d at 1512 (affirming the district court's adoption of an expert's report as a detailed basis for calculation).

## C. Final Restitution Amount

The Court finds Defendants Estrada and Clements jointly and severally liable to the victim. The Government must recalculate the full amount of Restitution owed in present value dollars using a 3.0 % discount rate.

## IV. Conclusion

In sum, the Court finds that the Government has proven by a preponderance of the evidence that as a proximate result of Defendants' offenses, Doe has incurred and/or can reasonably expect to incur $4,931,476.30 in losses as calculated with a 1.5% discount rate, including $2,572,515 in earnings and benefits, $123,691 in treatment and medical care, $1,304.30 in medical care reimbursement, and $2,233,966 in enjoyment of life. The Government must, however, recalculate losses using a discount rate of 3.0%.

Accordingly, it is **HEREBY ORDERED** that:

1. The Government's Sealed Request for Restitution, ECF No. 282, is **GRANTED IN PART** consistent with this Order;

2. The Government must recalculate losses using a discount rate of 3.0% and submit the recalculation to the Court within seven (7) days;

32

3.   Defendants Kevin Dwight Clements and Karyn L. Estrada are jointly and severally liable to Jane Doe for restitution in the amount recalculated by the Government using a discount rate of 3.0% under 18 U.S.C. § 1593; and

4.   The Court will issue an amended judgment for each Defendant reflecting the restitution requirement.

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE

33